AETNA CASUALTY & SURETY CO., Plaintiff,

v.

DOW CHEMICAL COMPANY, Defendant,

and

American Guarantee and Liability Co., et al., Insurer Defendants.

No. 93–73601.

United States District Court, E.D. Michigan, Southern Division.

Dec. 4, 1997.

Charles W. Browning, Detroit, MI.

Jonathan P. Rich, New York City.

Jack O. Kalmink, Detroit, MI.

Joseph A. Hinkhouse, Chicago, Illinois.

Ronald E. Reynolds, Birmingham, MI.

Matthew R. Wildermuth, Chicago, IL.

Ronald W. Rice, Southfield, MI.

Charles S. Bergen, Chicago, IL.

Randall Phillips, Bloomfield Hills, MI.

Robert J. Bates, Jr., Chicago, IL.

Robert G. Kamenec, Detroit, MI.

Michelle K. Enright, Minneapolis, MN.

James Case, Detroit, MI.

Charles C. Cheatham, West Bloomfield, MI.

Ira Bergman, New York City.

Anita G. (Raby) Fox, East Lansing, MI.

Michael E. Thoits, Troy, MI.

Stanley A. Prokop, Detroit, MI.

Robert J. Re, Morristown, NJ.

James Martin, Chicago, IL.

John F. Milan, Troy, MI.

Dale O. Thornsjo, Minneapolis, MN.

Gary Eller, Detroit, MI.

Mark Dugan, Kansas City, MO.

James G. Derian, Southfield, MI.

George F. Curran III, The Omni Officentre, Southfield, MI.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DOW, ZURICH, TRAVELERS, CENTURY AND FIREMAN'S FUND'S CROSS–MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND AND GRANTING AMERICAN GUARANTEE'S CROSS–MOTION FOR SUMMARY JUDGMENT

EDMUNDS, District Judge.

This action arises out of an insurance contract dispute. Defendants Dow Chemical Company and Dow Corning, Inc. (collectively "Dow") have been the target of environmental contamination claims in approximately 360 locations across the United States and Canada. Aetna Casualty & Surety Company is one of Dow's insurers. Aetna[1] filed this declaratory judgment action against Dow and 48 of Dow's primary and excess insurers requesting that the court determine the rights and liabilities of the parties under Dow's various insurance policies for coverage as to these environmental claims.

This matter comes before the Court on Dow's motion for partial summary judgment, in which Dow argues that its pre–1985 primary insurers are obligated to defend Dow and to reimburse Dow for defense costs it has or may incur while defending the underlying suits involved at nine of the ten Final Sites at issue in this litigation.[2] Dow's motion addresses the existence and scope of Dow's pre–1985 primary insurers' duty to defend Dow; not their duty to indemnify Dow. Defendant Insurers Travelers,[3] Fireman's Fund,[4] Zurich, American Guarantee and Liability Company, and Century[5] (collectively "Primary Insurers") have filed cross-motions for partial summary judgment arguing that they are not obligated to defend Dow or reimburse Dow for any defense costs in any of the underlying claims involved at any of the ten Final Sites.

---

1. Aetna currently identifies itself as Travelers Casualty and Surety Company f/k/a Aetna Casualty and Surety Company.

2. The ten final sites are identified as: Brookhurst; Cliffs–Dow; Daffron & Pinion; Farley Street; Hartley & Hartley; Midland, Texas; Monahans, Texas; Petro Processors, Inc. or PPI; Silresim; and Conalco. Dow's motion addresses all but the Conalco Final Site.

3. "Travelers" collectively refers to Defendants Travelers Indemnity Company, Travelers Insurance Company, and Travelers Casualty and Surety Company f/k/a Aetna Casualty and Surety Company.

4. Defendants Fireman's Fund Insurance Company and its subsidiaries, Associated Indemnity Corporation and American Insurance Company are collectively referred to as "Fireman's Fund."

5. Defendant Century Indemnity Company, successor to CCI Insurance Company, successor to Insurance Company of North America, successor to Indemnity Insurance Company of North America is referred to as "Century" and the relevant Century policies are referred to as "Century primary policies."

"Century Excess Insurers" refers to Century; Pacific Employers Insurance Co.; Central National Insurance Co. of Omaha with respect to policies written through Cravens, Dargan Pacific Coast as Managing General Agent; and Century Indemnity Company, successor to CCI Insurance Company, successor to Insurance Company of North America, formerly known as California Union Insurance Company. The excess liability insurance policies issued by the Century Excess Insurers are referred to as the "Century Excess Policies."

Dow's and the Primary Insurers' motions are **GRANTED IN PART** and **DENIED IN PART.** The Court concludes that, with the exception of those underlying claims described below that are not the functional equivalent of a "suit" within the meaning of the insurance contract and those underlying suits where Dow is not a named party, Dow has satisfied its burden of establishing that the underlying claims involved in the nine Final Sites at issue here are arguably covered under the respective Primary Insurers' policies, and therefore, the Primary Insurers implicated at each of the nine Final Sites owe Dow a duty to defend as to those underlying claims. Primary Insurers' obligation to defend is not dependent upon its obligation to indemnify, nor Dow's timely notice, formal tender or compliance with a policy's voluntary payment provision. The duty to defend is contractual, and it arises at the time the underlying suit is brought; not when it is tendered or when notice is given.

The Court further concludes that Dow is not entitled to summary judgment as to Primary Insurer's obligation to reimburse it for pre-tender defense costs. Dow's right to those costs is factually dependent upon its claim that it had an absolute right to control the defense of the underlying suits because a conflict of interest existed between it and its Primary Insurers. Questions of material fact remain as to whether a conflict-of-interest has been created thus giving Dow the absolute right to control the defense of the underlying suits.

## I. Facts

Since 1944, Dow's primary insurance carriers have insured Dow through a series of Comprehensive General Liability ("CGL") policies. Dow's pre–1985 primary insurers and their coverage periods are as follows:

| Insurer | Coverage Period |
| --- | --- |
| Century June | 1, 1944 to March 28, 1949 |
| Zurich and American Guarantee | March 28, 1949 to March 28, 1950 |
| Travelers | March 28, 1950 to Nov. 19, 1956 |
| Fireman's Fund | Nov. 19, 1956 to April 1, 1976 |
| Aetna (now Travelers CS) | April 1, 1976 to April 1, 1985 |

Dow implicates the following Primary Insurers at the following nine Final Sites:

| Insurer | Final Site |
| --- | --- |
| Century | Cliffs–Dow only |
| Zurich | Cliffs–Dow only |
| American Guarantee | Cliffs–Dow only |
| Travelers | Brookhurst |
| | Cliffs–Dow |
| Aetna | Brookhurst |
| | Cliffs–Dow |
| | Daffron & Pinion |
| | Farley Street |
| | Hartley & Hartley |
| | Midland, Texas |
| | Monahans, Texas |
| | Silresim |
| Fireman's Fund | Brookhurst |
| | Cliffs–Dow |
| | Daffron & Pinion |
| | Farley Street |
| | Hartley & Hartley |
| | Midland, TX |
| | Monahans, TX |
| | PPI |
| | Silresim |

## A. Relevant Policy Terms

Each of the Primary Insurers' policies provides coverage for "property damage," "bodily injury," or "personal injury." Each of the policies issued to Dow also contains a provision which obligates the Primary Insurer to defend in "any suit against the insured". That same clause further provides that the insurer may make such investigation, negotiation and settlement of any claim or suit as it deems expedient.

The Century policies provide that: "the company shall ... defend in the name and on behalf of the insured any suit against the insured alleging such injury or destruction and seeking damages on account thereof; even if such suit is groundless, false or fraudulent". Dow Exs. 2., 1944–45 policy. The remaining Century policies have a similar defense provision. *See* Dow Exs. 3–6.

Zurich and American Guarantee's 1949–50 policy provisions are substantially similar. *See* Dow Exs. 7–8. The same is true for Travelers' 1950–56 policies, Dow Exs. 9–10, 12, and Fireman's Fund's 1956–1969 policies, Dow Exs. 13–16. Beginning in 1970, however, the defense provision in Fireman's Fund's provides that the insurer "shall have the right and duty to defend any suit against the insured seeking dam-

ages on account of such personal injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent ... but the Company shall not be obligated to ... defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements." Dow Ex. 17–18.

Aetna's 1976–81 policies provide.that the insurer "shall have the right and duty to defend any suit against the insured seeking damages on account of such personal injury, ..., or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, ..., but the Company shall not be obligated to ... defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements." Dow Ex. 19. *See also* Dow Exs. 20–24. Aetna's policies taking effect after April 1, 1982 and continuing through April 1, 1985 contain an endorsement which provides that: "if a claim is made or a suit is brought the Company shall have the right but not the duty to investigate and settle such claims and to defend such suit; in any case in which the Company elects not to investigate, settle or defend, the *Insured* under the supervision of the Company shall make or cause to be made such investigation and defense as are reasonably necessary and, subject to prior authorization by the Company within the limits of liability stated in the schedule, will effect to the extent possible such settlement or settlements as the Company shall deem prudent. It is further agreed that the cost of investigating, handling and defending claims and suits are included in the limits of liability of the policy." Dow Ex. 25. *See also* Dow Exs. 26–27.

A number of the subject policies also contain cooperation clauses requiring the insured's cooperation with the insurer's defense·of any suit. The clauses also contain a voluntary payment prohibition which provides: "The insured shall not, except at his own cost, voluntarily make any pay-

ment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of each occurrence." Dow Ex. 9.

**B. The Parties' Cross–Motions**

Dow is before the Court on a motion for partial summary judgment arguing that each of the underlying environmental claims involves a suit for damages against Dow that potentially occurred during one or more of the Primary Insurers' policy periods. Thus, Dow seeks a declaration that Primary Insurers owe Dow a duty to defend in the underlying claims at issue in nine of the Final Sites. Dow also seeks a declaration that Primary Insurers are obligated to reimburse Dow for pre-tender defense costs it will or has already incurred. Primary Insurers respond with cross-motions arguing they do' not owe Dow a duty to defend because the duty: (1) is dependent upon their ultimate duty to indemnify; (2) does not arise unless the insured provides timely notice, formally tenders the claim to the insurer, and complies with the voluntary payment provision of the ·insurance contract; (3) does not arise unless the underlying claim is the functional equivalent of a "suit" for "damages" "against the insured"; and (4) does not have a financial component absent a breach.

**II. Standard for Summary Judgment**

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who

fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. Analysis

Dow's motion requires this Court to address the existence and scope of the duty to defend owed Dow by its Primary Insurers at nine of the ten Final Sites. It does not require the Court to address whether the Primary Insurers have breached their duty to defend, if any, or whether Primary Insurers owe Dow a duty to indemnify under their respective policies.

The Court turns first to the question whether the Primary Insurers owe Dow a duty to defend. It addresses when the duty arises, when and how it is determined, whether it is dependent upon the duty to indemnify, and whether it is conditioned upon Dow's formal tender of the defense to Primary Insurers or upon Dow's satisfaction of the notice or voluntary payment provisions in its contract for insurance. The Court next turns to the question whether the duty to defend has a financial component, and Dow's claim that, because a conflict of interest existed between Dow and the Primary Insurers, Dow had an absolute right to control the defense of the underlying claims, and thus the duty to defend becomes a duty that requires Primary Insurers to reimburse it for pre-tender defense costs. Finally, the Court addresses the question whether the underlying claims at the nine Final Sites are "suits" for "damages" "against the insured" thus triggering the duty to defend.

### A. Duty to Defend

#### 1. The Duty to Defend is Determined by Examining the Allegations in the Underlying Suit and the Policy Language at the Time the Suit is Brought

█ The duty to defend, which is contractual, arises when a claim is brought against the insured with allegations that "even arguably come within the policy coverage." *American Bumper and Mfg. Co. v. Hartford Fire Ins. Co.*, 452 Mich. 440, 450–51, 458, 550 N.W.2d 475, 481, 484 (1996). However, "[t]he duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor." *Id.* (citations omitted). The insurer is obligated to defend "even where the claim may be groundless or frivolous." *Id.* The insurer is also required to defend all the claims in an underlying suit even when some, but not all, of those claims are potentially within the policy coverage. *Id. See also Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 102 Mich.App. 136, 301 N.W.2d 832 (1980). Finally, it is well-established under Michigan law that the duty to defend exists even in situations where it is ultimately determined there is no duty to indemnify under the insurance policy. *See American Bumper. Accord, Dochod v. Central Mut. Ins. Co.*, 81 Mich. App. 63, 67, 264 N.W.2d 122, 124 (1978) (where the court observed that "[t]he duty to defend extends to the defense of actions of the nature and kind covered by the policy, irrespective of what the ultimate finding may be"); *Upjohn Co. v. Aetna Cas. & Sur. Co.*, 768 F.Supp. 1186 (W.D.Mich.1990) (where the court observed "[i]n evaluating whether there is a duty to defend, the policyholder is not required to prove—and the insurance carrier is not permitted to challenge—the ultimate right to indemnification").

█ The duty to defend is determined by examining the allegations of the underlying complaint and the provisions of the insurance policy, and inquiring whether the potential for indemnification exists. The inquiry asks whether the potential for

indemnification existed at the time the underlying suit was brought; it is not answered with the benefit of hindsight. *American Bumper,* 452 Mich. at 455, 550 N.W.2d at 483. If the potential exists, then the duty to defend arises. *Michigan Millers Mut. Ins. Co. v. Bronson Plating Co.,* 445 Mich. 558, 562, 519 N.W.2d 864, 866 (1994) (where the Court determined that a PRP letter is the functional equivalent of a "suit" because it "signaled the initiation of a legal proceeding" and thus "triggered the insurer's duty to defend"). Once triggered, the duty to defend continues until that stage in the proceedings is reached where there is no longer any uncertainty as to the possibility of coverage. *American Bumper,* 452 Mich. at 455, 550 N.W.2d at 483 ("insurers owe a duty to defend until the claims against the policyholder are confined to those theories outside the scope of coverage under the policy"); *American Bumper and Mfg. Co. v. Hartford Fire Ins. Co.,* 207 Mich.App. 60, 71, 523 N.W.2d 841, 846 (1994), *aff'd,* 452 Mich. 440, 550 N.W.2d 475 (1996) (where the court observed that the insurer's duty to defend continues "until such time as it can establish conclusively" that the claims in the underlying suit are not covered under the terms of its policy).

If, on the other hand, the potential for indemnification does not exist at the outset of litigation, the duty to defend never arises. This principle is illustrated in *Protective Nat. Ins. Co. of Omaha v. Woodhaven,* 438 Mich. 154, 476 N.W.2d 374 (1991), where the Michigan Supreme Court concluded there was no duty to defend under circumstances where it was clear from the outset of litigation that a pollution exclusion applied and there was no possibility for indemnification under the insurance contract. 438 Mich. at 160, 476 N.W.2d at 376. The third party complaint alleged damages sustained as an alleged result of exposure to chemical pesticide sprayed by Woodhaven. *Id.* at 156, 476 N.W.2d at 374. It was not disputed that Woodhaven intentionally sprayed the pesticide as part of a continuous program designed to control insects and pests and that the plaintiff's insurance policy had a pollution exclusion that provided coverage only for discharges, dispersals, releases or escapes that were "sudden and accidental." Plaintiff argued the potential for coverage existed because, although the "release" of the pesticide into the atmosphere was intentional and therefore not "sudden and accidental", the subsequent dispersal of the pesticide may have been.

The Court first interpreted the language of the pollution exclusion, and then examined the allegations of the underlying complaint to determine whether the potential for indemnification existed. It interpreted the policy language and held "the discharge, dispersal, release or escape to which both the exclusion and the exception refer is the initial discharge, dispersal, release, or escape into the atmosphere and not the subsequent migration." *Id.* at 162, 476 N.W.2d at 377. The Court further concluded that the pesticide was a "pollutant" within the meaning of the pollution exclusion, and Woodhaven's intentional release could not, as a matter of law, be "accidental" and thus did not fall within the "sudden and accidental" exception to the pollution exclusion. *Id.* at 162–63, 476 N.W.2d at 377–79. Thus, applying its construction of the policy language, the Court concluded "[t]here is no doubt, even after looking behind the third party's allegations, whether coverage is possible. It is not." *Id.* at 160, 476 N.W.2d at 376.

## 2. The Insurer's Duty to Defend Is Not Dependent Upon Its Ultimate Duty to Indemnify

Primary Insurers broadly proclaim that the duty to defend requires insurers to provide defense services at a time when the potential for indemnification coverage exists and does not require insurers to reimburse defense costs at a time when no uncertainties exist and insurers can prove they owe no duty to indemnify under the contract. They further argue that there is

no basis for applying the "potential for coverage" standard in cases that have been resolved either through judgment or settlement. Michigan law is to the contrary.

 It is a well-established principle of Michigan law that an insurer's duty to defend is broader than, and not dependent upon, its duty to indemnify. *American Bumper*, 452 Mich. at 450–51, 550 N.W.2d at 481 (1996). The fact that an insurer may ultimately avoid its duty to indemnify "is a matter separate and apart from its obligation to defend the insured." *Dochod*, 81 Mich.App. at 67, 264 N.W.2d at 124. *Accord, Stockdale v. Jamison*, 416 Mich. 217, 225, 330 N.W.2d 389, 392 (1982). It is the possibility of indemnification and not the insurer's ultimate obligation to indemnify under the insurance contract that gives rise to the duty to defend. The insurer's duty to defend arises, if at all, when the underlying claim is brought against the insured; it is not dependent upon the insurer's ultimate obligation to indemnify under the contract of insurance.

These principles were recently reaffirmed by the Michigan Supreme Court in the context of an environmental claim. In *American Bumper*, the Court held that the defendant insurers were required to reimburse their insured for defense costs it had incurred in response to an Environmental Protection Agency (EPA) claim even though the claim was ultimately demonstrated to be groundless, and there was no duty to indemnify under the terms of the contract. Rejecting the insurers arguments that they did not owe a duty to defend in light of their pollution-exclusion, lack of "occurrence", and loss-in-progress defenses, the Court held that, as long as uncertainty created the potential for indemnification, the insurers could not avoid their duty to defend. The Court emphasized that "[u]ncertainty regarding whether an allegation comes within the scope of the policy must be resolved in the policyholder's favor", and insurers owe a duty to defend until the uncertainty is resolved

and the insurer shows "the claims against the policyholder are confined to those theories outside the scope of coverage under the policy." 452 Mich. at 455, 550 N.W.2d at 483.

The Court first reaffirmed its holding in *Bronson Plating* that "an EPA PRP letter, similar to the one involved [in the instant case] constituted the initiation of a 'suit' that the insurer was required to defend under the terms of its CGL policy." *American Bumper*, 452 Mich. at 450, 550 N.W.2d at 481. Next, the Court rejected the insurers argument that they owed no duty to defend because any contamination that occurred from the insured's intentional discharging of wastewater into a seepage lagoon could not have been "sudden and accidental" and thus fell outside that exception to the policy's pollution exclusion. The Court clarified that as long as uncertainties existed as to application of a pollution exclusion or its exception, the insurers could not "escape their duty to defend on grounds of their pollution-exclusion clauses", and here there was uncertainty as to the existence, cause or source of groundwater contamination that required a clean-up. *Id.* at 455, 550 N.W.2d at 483. Quoting from its decision in *Polkow v. Citizens Ins. Co. of America*, 438 Mich. 174, 180, 476 N.W.2d 382 (1991), the Court emphasized that:

> Fairness requires that there be a duty to defend at least until there is sufficient factual development to determine *what caused the pollution* so that a determination can be made regarding whether the discharge was sudden and accidental. Until that time, the allegations must be seen as "arguably" within the comprehensive liability policy, resulting in a duty to defend.

*American Bumper*, 452 Mich. at 452, 550 N.W.2d at 481 (emphasis added).

The Court also rejected the insurers' argument that there was no duty to defend in the underlying EPA suit because there could not have been an "occurrence" as defined under their policies because

groundwater contamination, if any, was expected or intended by the insured when it discharged wastewater used in its manufacturing process into a large seepage lagoon. The Court observed that the "cause and source of any possible contamination was uncertain" during the entire remedial investigation/feasibility study (RI/FS) period and the uncertainty continued up until the time the EPA suit was finally resolved. Thus, from beginning to end, "it was unclear whether an 'occurrence' had taken place because it had not ... been established whether [the insured] had caused any property damage that it neither expected nor intended." *Id.* at 453–54, 550 N.W.2d at 482. Accordingly, during this period of uncertainty, the insurers were obliged to defend the insured in the underlying suit. The Court explained:

> With the benefit of hindsight, we know that there was never an "occurrence" as defined under the policies because there never was pollution, sudden or accidental, resulting in property damage that required a cleanup. This was not established, however, until the no-action determination was issued and [insured]'s defense had been successfully completed. By that time, it was too late for the insurers to complain that they did not owe a duty to defend. The defense had fully run its course, exonerating [the insured] of the EPA's claims.

*Id.* at 455, 550 N.W.2d at 483. The Court emphasized that "those insurers that did not have pollution-exclusion clauses can no more escape their duty to defend by relying on the definition of 'occurrence' in their policies than those insurers that had pollution exclusions." *Id.*

The *American Bumper* Court further observed that the analysis that applies to "occurrence" policies also applies to "accident" policies. Accident policies are those that "provide coverage for property damage 'caused by accident.'" *Id.* at 456 n. 16, 550 N.W.2d at 483 n. 16. Under an accident policy, an insurer is obligated to defend its insured as long as "it was at least

arguable that an accidental discharge of pollution might have occurred", and the duty continues until that possibility is ruled out. *Id.* The Court emphasized that, under these circumstances, the insurer under such a policy "cannot escape a duty to defend by arguing that there can be no coverage because there was no accident." An "accident" based insurer, similar to an "occurrence" based insurer, cannot use hindsight to argue a duty to defend never arose.

Next, the Court rejected the insurers' argument that there was no duty to defend "because coverage was never appropriately triggered during the applicable policy period." *Id.* at 457–58, 550 N.W.2d at 483–84. After declining to adopt a specific trigger theory, the Court observed that, whatever trigger theory it eventually adopts, the insurers' duty to defend will arise and will continue as long as there is uncertainty whether an "occurrence" could have taken place within their respective policy periods. *Id.* The Court reasoned that:

> because the duty to defend includes groundless and frivolous claims, and the insurer must provide a defense if there are any theories of recovery that even arguably fall within the policy, *the duty to defend is triggered when a claim is made against the insured that even arguably comes within the policy's period and scope of coverage.*

*Id.* at 458, 550 N.W.2d at 484 (emphasis added).

Finally, as to the insurers' argument that they owed no duty to defend under the loss-in-progress doctrine, which provides that "an insurer is not liable if the loss was already in progress before the policy's coverage took effect", the Court observed that: (1) it had not yet applied this doctrine in the context of an environmental dispute; (2) it was unnecessary to consider adoption of the doctrine in the instant case; and (3) even if the Court were to adopt the doctrine it would not help the insurers because they " 'owe a duty to defend until such time as they can

contain the claims against their insured to an event that does not come within the coverage of the policy or to a time period that falls outside the policy.'" *Id.* at 484–85 n. 16 (quoting *American Bumper*, 207 Mich.App. at 70–71, 523 N.W.2d 841). Accordingly, despite a loss-in-progress defense, an insurer's duty to defend would arise and continue until such time that they could show the loss complained of was already in progress before a policy took effect.

### 3. Primary Insurers Cannot Avoid Their Duty to Defend by Arguing From Hindsight That There is no Duty to Indemnify

■ As recognized by the Court in *American Bumper*, Primary Insurers cannot wait until the defense of an underlying claim has been completed to complain that they did not owe a duty to defend because from hindsight it could be established that: (1) the "sudden and accidental" exclusion to a pollution exclusion did not apply; (2) there was no "occurrence" as defined under the policy; (3) there was no "accident" as defined under the policy; (4) there were no damages that occurred or manifested during a period covered under the policy; or (5) the loss complained of was already in progress before the policy's coverage took effect. Primary Insurers have not shown that, at the outset of the underlying suit, there was no uncertainty as to the cause or source of the alleged contamination and thus no uncertainty whether the alleged contamination (1) was sudden or accidental; (2) was an "occurrence" or "accident" as defined under the policy; (3) could have caused damage that occurred during a relevant policy period; or (4) could have involved losses that were in progress before a policy took effect. Accordingly, with the exception of those few instances discussed below where Fireman's Fund successfully argues the underlying claim is not a "suit" for damages "against the insured", Primary Insurers have not met their burden by showing that, at the time the underlying suits were brought, there was no potential for indemnification under their respective policies. Until such time as the uncertainties are resolved "the allegations must be seen as 'arguably' within the comprehensive liability policy, resulting in a duty to defend.'" *American Bumper*, 452 Mich. at 451, 550 N.W.2d at 481 (quoting *Polkow*, 438 Mich. at 180, 476 N.W.2d 382).

Accordingly, this Court DENIES Travelers' cross-motion for summary judgment in which it argues that it owes no duty to defend based upon its present ability to demonstrate Dow is not entitled to indemnification in light of (1) its policies' pollution exclusion, (2) lack of property damage in a policy period, (3) application of the manifestation trigger theory, and (4) application of the known loss/loss in progress doctrine. This Court likewise DENIES Zurich, Fireman's Fund, and Century's cross-motions for summary judgment raising similar arguments. Finally, Century's cross-motion is DENIED as to its argument that it owes Dow no duty to defend based upon its present ability to demonstrate there was no "accident" within the meaning of its policies. Century's argument fails to acknowledge that the Michigan Supreme Court has interpreted "accident", when left undefined in an insurance policy, as:

anything that begins to be, that happens, or that is a result which is not anticipated and is unforeseen and unexpected by the person injured or affected thereby—that is, takes place without the insured's foresight or expectation and without design or intentional causation on his part. In other words, an accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.

*Group Ins. Co. v. Czopek*, 440 Mich. 590, 597, 489 N.W.2d 444 (1992). The Michigan Supreme Court has further instructed that courts are to evaluate the "accident" from

the standpoint of the insured when the insurance policy is silent with respect to perspective. *Auto Club Group Ins. Co. v. Marzonie*, 447 Mich. 624, 527 N.W.2d 760 (1994) (opinions of Chief Justice Cavanagh, and Justices Levin, Brickley, and Griffin); *Arco Ind. Corp. v. American Motorists Ins. Co.*, 448 Mich. 395, 405, 531 N.W.2d 168 (1995). Century has not done that here.

Primary Insurers' arguments that their duty to defend is conditioned upon timely notice, formal tender, or compliance with the voluntary payment provision of their insurance contracts are also inconsistent with prevailing Michigan law.

### 4. Timely Notice, Formal Tender and Satisfaction of a Voluntary Payment Provision Are Not Prerequisites to the Duty to Defend

Primary Insurers argue that the insured must want and request that the insurer provide a defense service before the duty to defend will arise. Relying principally on the district court decision in *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 790 F.Supp. 1318 (E.D.Mich.1992) (*Ex–Cell–O II*), they assert that tender gives rise to the duty to defend. Stated more fully, Primary Insurers argue that absent tender, there can be no duty to defend; absent duty, there can be no breach; absent a breach, there can be no obligation on their part to reimburse defense costs. This Court disagrees.

They confuse events which give rise to the duty to defend (an underlying suit is brought against the insured with allegations that are arguably within the insurance policy's indemnification provisions) and events which give rise to an insurer's breach of that duty (awareness of the need for defense and an unjustified refusal to defend). This Court believes that *Ex–Cell–O II*'s holding to the contrary is in-

correct. The Michigan Supreme Court has never held that notice, let alone formal tender of a defense, gives rise to the duty to defend. There is no policy language or Michigan case law to support this position.

█ Under Michigan law, the duty to defend pre-exists any obligation on the part of the insured as to notice or compliance with the voluntary payment provision of an insurance contract. Once the duty arises, it will continue "until such time as [the insurer] can establish conclusively" that the potential for indemnification coverage no longer exists. *American Bumper*, 207 Mich.App. at 71, 523 N.W.2d at 846. Thus, the insured's breach of those provisions cannot be used to argue, in hindsight, that the duty to defend never arose. This principle is illustrated below using Primary Insurers' argument that timely notice is required before its duty to defend will arise.

█ It is contrary to Michigan law to argue that timely notice is a precondition to the duty to defend. The duty arises when the underlying claim is brought and thus pre-exists the insured's obligation to notify its insurer of that suit. It is a well-established principle of Michigan law that untimely notice will not excuse an insurer's obligation to indemnify unless it can prove it was actually prejudiced by the insured's delay. *Wendel v. Swanberg*, 384 Mich. 468, 478–79, 185 N.W.2d 348, 353 (1971); *Weller v. Cummins*, 330 Mich. 286, 47 N.W.2d 612 (1951); *Kleit v. Saad*, 153 Mich.App. 52, 395 N.W.2d 8 (1985); *Burgess v. American Fidelity Fire Ins. Co.*, 107 Mich.App. 625, 628–29, 310 N.W.2d 23, 24–25 (1981). Put in contract terms, these cases recognize that an insured's breach of a notice provision will not be deemed material and will not excuse the insurer's performance under the contract unless the insurer can prove it was prejudiced by the untimely notice.[6] Accordingly, it makes no

---

**6.** The Michigan Supreme Court examined the purpose of the notice provision; i.e., to "allow the insurer to make a timely investigation of the accident in order to evaluate claims and to defend against fraudulent, invalid, or excessive claims", and adopted a rule that

sense to argue that the duty to defend, which is broader than the duty to indemnify, is conditioned upon timely notice.

As the courts in *Upjohn Co. v. Aetna Cas. and Sur. Co.*, 768 F.Supp. 1186, 1200–01 (W.D.Mich.1990) and *Vermont Gas Systems v. United States Fidelity & Guar. Co.*, 805 F.Supp. 227, 232 (D.Vt.1992) have observed, the untimely notice defense involves a fact-specific inquiry whether the insurer will be excused from its duty to indemnify because it has been prejudiced by the insured's late notice; it should not be interpreted as a condition precedent to the insurer's duty to defend. Moreover, the duty to defend "is triggered where the allegations in the complaint are even arguably within the insurance policy's protection, viewing the issue by comparing only the policy language and the allegations in the underlying proceeding." *Upjohn*, 768 F.Supp. at 1203. "In assessing the duty to defend, facts outside the allegations that might negate coverage are not properly considered.... The late notice facts are thus inappropriate to a discussion of the duty to defend—they certainly go beyond the allegations and policy language." *Id.* Simply stated, "a possibility of coverage exists until such time as the notice issue is resolved," and, therefore, the duty to defend continues until the notice issue, including proof of prejudice, is resolved. *Vermont Gas*, 805 F.Supp. at 232–33. For the above stated reasons, this Court disagrees with the district court decisions that hold otherwise. *See CPC Intern., Inc. v. Aerojet–General Corp.*, 825 F.Supp. 795 (W.D.Mich.1993); *Container Specialties, Inc. v. Aetna Casualty and Surety Co.*, No. 95–CV–40154–FL (E.D.Mich. July 9, 1997) (unpublished opinion).

Primary Insurers rely primarily on *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp. (Ex–Cell–O II)* to support their position. As stated above, this Court disagrees with the reasoning and conclusion reached in *Ex–Cell–O II*. Like Primary Insurers here, the court in *Ex–Cell–O II* conflates events giving rise to the duty to defend and those events giving rise to a breach of that duty. The issue before the court there was whether the insured was entitled to pre-tender defense costs as damages caused by the insurer's breach of its duty to defend. The court's confusion is evident in its holdings:

> While notice alone, without specific tender of defense, followed by a denial of coverage may, in Michigan, constitute a breach of the duty to defend for unsophisticated policyholders, in the present case we are dealing with sophisticated policyholders who had available both in-house and outside legal advice. Thus, in the present case, there is no reason to waive the tender of defense as a condition precedent to the insurance company's duty to defend.

*Ex–Cell–O II*, 790 F.Supp. at 1330.

Moreover, the rationale for the court's erroneous prediction that "the Michigan Supreme Court would, at least among sophisticated parties, require a tender of defense before the duty to defend arises", *Id.* at 1339, has eroded. The Michigan Supreme Court has not adopted the position found in the insurance estoppel cases that *Ex–Cell–O II* relied upon; i.e., that "absent a request, an insurer has no duty to defend." *See Celina Mut. Ins. Co. v. Citizens Ins. Co. of America*, 133 Mich.App. 655, 662, 349 N.W.2d 547 (1984); *Detroit Auto. Inter–Ins. Exchange v. Higginbotham*, 95 Mich.App. 213, 290 N.W.2d 414 (1980); *American Mut. Liability Ins. Co. v. Michigan Mut. Liability Co.*, 64 Mich.App. 315, 323, 235 N.W.2d 769 (1975). To the contrary, the Michigan Supreme Court's decisions observe that the duty to defend arises when an underlying claim is first brought against the insured asserting claims that are potentially covered under the policy. *See American*

would not allow an insurer to avoid its duty to indemnify under the insurance contract unless it could show that these interests were prejudiced by the insured's late notice. *Wendel*, 384 Mich. at 477, 185 N.W.2d 348.

*Bumper,* 452 Mich. at 455, 550 N.W.2d at 483; *Bronson Plating,* 445 Mich. at 562, 519 N.W.2d at 866.

Likewise, the decision *Ex–Cell–O II* relied upon for its determination that tender should be the trigger for the duty to defend when dealing with sophisticated as opposed to unsophisticated parties has also been rejected. An Illinois appellate court recently revisited and rejected that position as previously adopted in *Hartford Accident & Indem. Co. v. Gulf Ins. Co.,* 776 F.2d 1380, 1382 (7th Cir.1985), by the Seventh Circuit interpreting Illinois law.

In *Federated Mut. Ins. Co. v. State Farm Mut. Aut. Ins. Co.,* 282 Ill.App.3d 716, 218 Ill.Dec. 143, 668 N.E.2d 627 (1996), the court observed that there was no principled reason for distinguishing between sophisticated and unsophisticated insurers and further observed that a formal tender requirement was a meaningless "technicality" that served "absolutely no benefit to the insurer, other than [providing] a loophole through which the insurer may escape a lawful contractual obligation [to defend]." *Id.* at 726, 218 Ill.Dec. 143, 668 N.E.2d at 633. Rejecting the sophisticated versus unsophisticated insured distinction, the court reasoned:

> Attributing expertise to the sophisticated insured and on this basis requiring a written tender is merely a description of a court's preference between two sophisticated parties; it is not a rationale for that preference. An insurer is also a sophisticated party. If it has actual notice a lawsuit has been filed against one of its insurers, the insurer understands its insured will require a defense. Furthermore, based on its experience, the insurer should assume its insured will desire the insurer provide such defense. Both parties are assumed to understand the ramifications of a lawsuit. Why then should the insurer receive the benefit of a rule requiring written tender on the basis that the insured is also sophisticated? Such a rule requires an insured to jump through meaningless hoops towards an absurd end: telling the insurer something it already knows. Such a rule injects a degree of gamesmanship into the insurer-insured relationship without providing any valid corresponding benefit. In fact, the only benefit of such rule is to create a possibility—where none would otherwise exist—for an insurer to escape an obligation it otherwise owes its insured.

*Id.* at 725, 218 Ill.Dec. 143, 668 N.E.2d at 632–33. Finally, the court observed that a written tender rule was inconsistent with Illinois insurance law that, similar to Michigan insurance law, "traditionally favors the insured in determining whether the insurer must provide a defense" and requires a defense for all claims "potentially within the policy coverage." *Id.* at 725–26, 218 Ill.Dec. 143, 668 N.E.2d at 633.

This court also questions the soundness of *Ex–Cell–O II*'s adoption of the "tender triggers the duty to defend" rule based on the voluntary payment prohibition contained in the cooperation clause of an insurance contract. Here, the court conflates events giving rise to the insurer's duty to defend with events that may give rise to the insured's breach of one of the policy's conditions; i.e., voluntarily incurring defense costs without the insurer's consent.

■ In sum, absent policy language supporting a rule that formal tender gives rise to the insurer's duty to defend, and in light of conflicting case law, this Court finds *Ex–Cell–O II* to be wrongly decided. Both its reasoning and its result are rejected. The insured's tender of the defense, formal or otherwise, and the insurer's unjustified refusal to defend are relevant factors in the inquiry whether the insurer has breached its duty to defend and what damages result from that breach; they are not relevant to the inquiry whether the duty to defend exists in the first instance.

The Court now turns to Dow's request for a declaration that it is entitled reimbursed for pre-tender defense costs.

## B. Financial Component of the Duty to Defend—Dow's Right to Reimbursement of Pre–Tender Defense Costs

Dow is not arguing that Primary Insurers breached their duty to defend. Rather, Dow argues Primary Insurers' duty to defend includes the duty to reimburse it for pre-tender defense costs. The essence of Dow's argument is as follows: (1) the duty to defend arises when a suit is brought against the insured with allegations that potentially obligate the insurer to indemnify; (2) there is a financial component to the duty to defend; i.e., when the insurer creates a conflict of interest with its insured, it loses the right to control the defense and the duty to defend becomes a duty to reimburse defense costs; (3) the voluntary payment prohibition contained in the cooperation clause of the insurance contract is not implicated, and thus cannot be breached, in conflict-of-interest situations where the insured has the absolute right to control the litigation; and (4) even if this court were to find the voluntary payment provision is implicated, it should, consistent with Michigan law as to similar insurance policy conditions, require the insurer to prove it has been prejudiced by the insured's voluntary payments before it is excused from performing either its defense or indemnification duties.

■■■ Primary Insurers' respond that, absent a breach, the duty to defend does not have a financial component. The obligation, they assert, is to provide services; not money. This argument, however, fails to acknowledge those situations where a conflict of interest exists between the insurer and insured because the insurer has asserted coverage defenses that raise the same issues raised by the plaintiff in the underlying action against the insured.

When the insurer creates a conflict-of-interest situation, the insured obtains the right to control the defense, and the duty to provide defense services becomes a duty to reimburse independent counsel for the reasonable and necessary costs incurred in defending the insured. *See generally* Annot: *Duty of insurer to pay for independent counsel when conflict of interest exists between insured and insurer,* 50 A.L.R.4th 932, and cases cited therein. *See also* 14 Couch on Insurance 2d (Rev ed) § 51:55 at 514–15, § 51:60 at 539, § 51:70 at 569–71; 7C Appleman, Insurance Law & Practice, § 4685.01 at 139–41; Windt, Insurance Claims & Disputes, §§ 4:20, 4.22.

Although the Michigan Supreme Court has not yet directly addressed this issue, in *Allstate Ins. Co. v. Freeman,* it quoted with approval the suggestion that in a conflict situation " 'the insured must be informed of the nature of the conflict and given the right either to accept an independent attorney selected by the insurer or to select an attorney himself to conduct his defense; if the insured elects to choose his own attorney, the insurer must assume the reasonable costs of the defense provided.' " 432 Mich. 656, 703 n. 3, 443 N.W.2d 734, 756 n. 3 (1989) (Boyle, J.) (quoting Annot: *Construction and application of provision of liability insurance policy expressly excluding injuries intended or expected by insured,* 31 A.L.R.4th 957, 976). *See also American Home Assur. Co. v. Evans,* 589 F.Supp. 1276, 1286 (E.D.Mich. 1984), *vacated on other grounds,* 791 F.2d 61 (6th Cir.1986) (where it was predicted that the Michigan Supreme Court would recognize that in a conflict situation, "the insurer's desire to control the litigation must give way to its obligation to defend the insured" thus requiring the insurer to provide independent counsel to handle insured's defense); *Federal Ins. Co. v. X-Rite, Inc.,* 748 F.Supp. 1223, 1226–1230 (W.D.Mich.1990) (where the court similarly recognized that in conflict-of-interest situations, the insurer does not have an absolute right to control the litigation and inde-

pendent counsel is required, however, it would not, under the facts of that case, disturb the insurer's choice of counsel because the insured had not shown counsel was not truly independent); Windt, Insurance Claims & Disputes § 4.22 at 229–30 (observing that, regardless of who selects independent counsel, the net result is that control of the defense is taken out of the insurer's hands).

Dow argues that a conflict-of-interest situation exists here. It contends that Primary Insurers' claim that they want, and are being deprived of, their contractual right to provide defense services is belied by the fact that they have contested their duties to defend and indemnify Dow in each of the underlying suits at issue in the nine Final Sites. Dow points this Court to its previous observation that " '[p]articularly in the environmental liability context, the insured often enters and acts in the underlying litigation alone, with an apprehension of not only the outcome of that litigation, but also of the foreboding litigation with its insurers.' " 3/10/97 Opinion and Order at 8 (quoting *Pittston v. Allianz Ins. Co.*, 143 F.R.D. 66, 70–71 (D.N.J. 1992)). It emphasizes that in environmental insurance cases "litigation, not cooperation, is the rule." *See* Lawless, *Awakening the Giant*, 5 No. 1 Coverage 14 (1995) ("Since the early 1970s, policyholders have been at war with their insurance carriers over who is going to pay for environmental liabilities.") It is against this backdrop that Dow insists a conflict-of-interest situation exists. It argues that this Court must consider its supporting papers showing (1) the parties' long-term relationship; (2) Primary Insurers' consistent refusal to defend (e.g., their position that PRP letters are not "suits" requiring a defense); (3) their consistent reservation of rights asserting defenses that place them in conflict with Dow; (4) their awareness that suits have been filed and Dow's need for a defense absent any formal tender; and (5) their willingness to allow Dow to defend itself without ever attempting to assert their

right to control or participate in that defense. Dow claims that consideration of these factors demonstrates that Primary Insurers aligned themselves with underlying plaintiffs, placed themselves in conflict with Dow, and thus gave Dow the right to control its own defense in the underlying suits. Accordingly, Dow argues, it cannot be said to be in breach of the voluntary payment clauses in Primary Insurers' insurance contracts because the clauses are not implicated in a conflict-of-interest situation, and furthermore, under these circumstances, Primary Insurers' duty to defend requires them to reimburse Dow for its pre-tender defense costs.

Primary Insurers disagree with Dow and have presented the Court with conflicting evidence. Their supporting papers show that (1) Dow was not consistently denied a defense, (2) some of the underlying claims were not initially defended because Dow withheld them based on its belief the claim was not potentially covered under its policies; (3) Primary Insurers were unaware of a great many of these underlying claims until this lawsuit was filed; and (4) the parties' relationship has historically been one of cooperation, not conflict.

■ This Court DENIES Dow's motion for summary judgment as to its request for pretender defense costs. Dow's claim that it is entitled to these costs is factually dependent upon its claim that Primary Insurers created a conflict-of-interest situation giving it an absolute right to control its own defense in the underlying suits. Questions of fact exist on this issue as to each of the underlying claims, including: (1) when, if at all, Primary Insurers were made aware of an underlying claim and Dow's need for a defense; (2) when and what defenses to coverage were asserted by Primary Insurers; and (3) whether any Primary Insurers were aware of the fact that Dow was defending an underlying suit yet took no affirmative step to try and assert its right to control the defense of that underlying suit.

In light of the above ruling, the Court need not, at this time, answer the question whether the Michigan Supreme Court would interpret the voluntary payment provision similar to notice provisions which require insurers to prove prejudice before excusing their performance.

Having addressed when the duty to defend arises, when and how it is determined, whether it is dependent upon the insurer's duty to indemnify or conditioned upon the insured's formal tender and compliance with a policy's notice and voluntary payment provisions, and Dow's claim that it is entitled to reimbursement for pretender defense costs, the Court now turns to Fireman's Fund's argument that it does not owe Dow a duty to defend certain of the underlying claims at the nine Final Sites because they are not "suits" for "damages" "against the insured."

### C. Are the Challenged Underlying Claims "Suits" for "Damages" "Against the Insured" that Trigger the Duty to Defend

Dow contends that each underlying claim at the nine Final Sites triggers the Primary Insurers' contractual duty to defend because each involves a "suit" for "damages" "against the insured"; i.e., a governmental enforcement action or private action, against Dow alleging property damage, personal or bodily injury caused by exposure to materials allegedly generated by Dow. Fireman's Fund is the only Primary Insurer to dispute Dow's contention by arguing that not all of the underlying claims involve "suits" for "damages." Fireman's Fund[7] also disputes Dow's claim that it is obligated to defend underlying suits that are not brought against Dow, its named insured. The Court first addresses the argument that some of the underlying claims are not "suits" as that term has been construed under Michigan

law and then addresses the argument that only suits that name Dow can be construed as suits "against the insured" and thus trigger the duty to defend.

### 1. "Suit" for "Damages"

■ Fireman's Fund argues that three of the claims at two of the Final Sites are not the functional equivalent of "suits" and thus do not give rise to a duty to defend. At issue are: (1) August 30, 1983 and October 13, 1983 Texas Dept. of Water Resources' notice of violation letters as to the Midland and Monahans, Texas Final Sites, respectively; and (2) the 1985 U.S. EPA RCRA Complaint as to the Monahans, TX site. *See* Dow Exs. 242, 226, and 228. This Court finds that the 1983 notice of violation letters are not the functional equivalent of "suits" and thus do not give rise to a duty to defend. This result is supported by the deposition testimony of the author of these letters where he admits that their purpose is to notify of operating violations and further admits that they do not constitute an official enforcement action. *See* Dow Ex. 228, W. Lockey Dep. at 23–24. Michigan is in the forefront in recognizing PRP letters as "suits" but has not gone as far as Dow urges it to go here. Unlike PRP letters, these notice of violation letters do not "signal[ ] the initiation of a legal proceeding that [is] the functional equivalent of a traditional court action, and thereby [do not] trigger[ ] the insurers' duty to defend." *Bronson Plating*, 445 Mich. at 574, 519 N.W.2d at 866. Accordingly, Fireman's Fund is entitled to summary judgment on the duty to defend issue as to these two underlying claims. It is likewise entitled to a summary judgment as to the 1985 U.S. EPA RCRA complaint but for different reasons.

---

**7.** Fireman's Fund has also filed a motion for summary judgment set for hearing in March 1998 which argues that it does not owe Dow a duty to defend or indemnify in those suits were Dow is not a named party. Travelers and the Century Excess Insurers have joined Fireman's Fund's motion.

## 2. "Against the Insured"

Fireman's Fund further argues that the relevant insurance contracts obligate the insurer to defend only those underlying suits where their insured, Dow, is a named party. The Final Sites and specific claims for which Insurers make this argument are as follows: (1) the R & H Wells suit at the Monahans, TX Final Site (Dow Ex.119); (2) the 1985 U.S. EPA RCRA complaint at the Monahans, TX Final Site (Dow Ex.117); (3) the State of Wyoming suit at the Brookhurst Final Site (Dow Ex 38); (4) August 15, 1989 Texas Water Commission letter to DSI ordering abatement (Dow Ex.243); and (5) May 29, 1992 Texas Water Commission Preliminary Report and Petition (Dow Ex.244). Each underlying claim is brought against Dowell Schlumberger, Inc. (DSI), a joint venture created in 1984; not Dow. Fireman's Fund argues that there is no contract language or case law that would obligate them to defend suits that are brought against parties other than their named insured. This Court agrees.

There is no dispute that the challenged suits are not brought against and do not name Dow. Nonetheless, Dow argues that its Primary Insurers are obligated to defend those suits because the suits involve some "allegations relating to a time when Dow was the sole owner of the site." Dow Reply Br. at 46. The Court is not persuaded by Dow's argument.

First, there is no contract language supporting the position that DSI, a 50/50 joint venture that was formed by Dow and Schlumberger in 1984, eight years after Fireman's Fund's last policy expired, is a named insured under any of the Fireman's Fund/Dow policies. The relevant policies define "Named Insured" as "The Dow Chemical Company and any domestic or foreign corporation in which it owns or may own, directly or indirectly, more than 50% of the combined voting power." FF Named Insured Br. Ex. 1. None of the policies did or could include DSI as a named insured because DSI was not even formed until years after the policies expired. Further, the contract liability endorsements [8], which were included in some of Fireman's Fund's policies, cannot be construed to include contracts that did not come into existence until many years after the policy's coverage period had expired. The Court arrives at this conclusion after applying the well-established contract principles that (1) when construing contract language, it is to determine and give effect to the parties' intent as discerned from the policy's language, *Auto–Owners Ins. Co. v. Churchman*, 440 Mich. 560, 489 N.W.2d 431 (1992); and (2) it is improper for the Court to ignore the plain meaning of the policy's language in favor of a technical or strained construction, *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F.Supp. 59, 66 (W.D.Mich.1989). DSI is not a named insured under the contract, and the Court will not obligate Insurers to defend strangers to their contract of insurance.

Furthermore, Dow has failed to provide the Court with any case law that supports its broad premise that its insurers must defend suits that do not directly name Dow but may in some way implicate Dow. Dow admitted at the hearing on this motion that in each of these challenged underlying suits, where DSI is the named party and not Dow, there is no direct legal threat against Dow; that a judgment against DSI will not allow plaintiffs to collect damages from Dow. Adoption of Dow's position would effectively read the language "against the insured" out of the insurance contract. This is something the Court is not permitted to do. It is required to consider the contract as a whole and give meaning to all its terms. *Churchman*, 440 Mich. at 566, 489 N.W.2d 431. Moreover,

---

8. The contract liability endorsement is included in three of the six Fireman's Fund policies and provides that "Such insurance as is afforded by the policy applies to any obligation assumed by the named insured under any contract or agreement to defend any person, firm or organization." FF Named Insured Br., Ex. 3.

adoption of Dow's position would require the Court to ignore that (1) the plaintiff is the master of his lawsuit; (2) the court can render judgments only as to parties properly before it; and (3) Dow has not been sued or formally brought into the action, and thus, as Dow admits, a judgment against an entity other than Dow will not permit a plaintiff to collect that judgment from Dow.

Dow's reliance on *Continental Cas. Co. v. Cole,* 809 F.2d 891 (D.C.Cir.1987) is misplaced. *Continental Cas. Co.* presented unique factual circumstances where there was a separate related action between the underlying plaintiff and the unnamed insureds who were later implicated in a motion filed in another action pending before the same court. In this later motion, the plaintiff attempted to reargue its suit against the unnamed insureds and demanded compensatory and punitive damages denied in that separate action. The court, noting the "peculiar circumstances" of the case, held that the insurer was obligated to defend the unnamed insureds. *Id.* at 899. Under the unique circumstances presented, the court considered this second matter a "suit against the insured," even though the insured was not a named party, because the matter involved a direct legal threat against the insureds. *Id. See also* 7C Appleman, Ins. L. & P. § 4682 (1996–97 Pocket Part) at 4.

In light of the above, this Court DENIES IN PART Dow's motion and GRANTS IN PART Fireman's Fund's motion as to the underlying claims described above.

## D. Remaining Issues

### 1. American Guarantee

Dow has conceded that American Guarantee's policy is not implicated in any of the underlying suits at the Final Sites because it provides product liability coverage; not general comprehensive liability coverage. Accordingly, American Guaran-

tee's cross-motion for partial summary judgment is GRANTED.

### 2. Zurich and Century Primary Insurers

Dow has conceded that, as to the ten Final Sites at issue here, Zurich and the Century Primary Insurers are implicated only at the Cliffs–Dow Final Site, and they do not owe Dow a duty to defend or indemnify as to the remaining nine Final Sites, and thus Zurich and the Century Primary Insurers' cross-motions for partial summary judgment are GRANTED IN PART to reflect this.

### 3. Issues That are to be Decided Later

#### a. Century Primary Insurer

At the hearing on the above cross-motions, the Court noted that it would consider in March 1998 the argument raised in the Century Primary Insurer's cross-motion that it does not owe Dow a duty to indemnify under its "accident" based policies.

#### b. Allocation of Costs Among Insurers

The issue whether, and how, defense costs are to be allocated or apportioned among Primary Insurers will be decided after it has been determined which Primary Insurers, if any, owe defense costs.

## IV. Conclusion

For the foregoing reasons, Dow, Zurich, Travelers, Century, and Fireman's Fund's cross-motions for partial summary judgment on the duty to defend are GRANTED IN PART and DENIED IN PART, and American Guarantee's motion is GRANTED.